UNITED STATES AVIATION UNDER-WRITERS, INC., a New York corporation; Paul Leadabrand, an Idaho resident; Jeflyn Aviation, Inc., an Idaho corporation, doing business as Access Air, Plaintiffs–Appellees,

v.

PILATUS BUSINESS AIRCRAFT, LTD., a Colorado corporation; Pilatus Flugzeugwerke Aktiengesellschaft, a Swiss corporation; Pilatus Aircraft, Ltd., a Swiss corporation; Pratt & Whitney Canada, Inc., a Canadian corporation; and Does 1 through 500, Inclusive, Defendants–Appellants.

Nos. 07–1432, 07–1435.

United States Court of Appeals, Tenth Circuit.

Aug. 26, 2009.

1134

Robert B. Schultz, Schultz & Associates, Arvada, CO, for Defendants–Appellants.

Thomas J. Byrne (William White with him on the brief), Byrne, Kiely & White, LLC, Denver, CO, for Defendant–Appellant Pratt & Whitney Canada Corp.

Jeffrey J. Williams, Esq. (Jon A. Kodani, Esq., with him on the briefs), Law Offices of Jon A. Kodani, Santa Monica, CA, for Plaintiffs–Appellees.

Before TACHA, MURPHY, and TYMKOVICH, Circuit Judges.

MURPHY, Circuit Judge.

## I. Introduction

This case arises out of an airplane crash in the Sea of Okhotsk. On board the airplane were members of a fraternal aviation organization. The purpose of the trip was aircraft evaluation and demonstration. No one was seriously injured in the crash. The airplane's insurer, the aviation company that operated the airplane, and one of it co-owners brought this product liability action against, *inter alia*, the manufacturers of the airplane and its engine. A jury returned a verdict finding the manufacturers partially liable for the crash.

Exercising jurisdiction pursuant to 18 U.S.C. § 1291, we hold that the district court correctly refused to apply admiralty law to this crash because the activity of flying for the purpose of aircraft evaluation and demonstration bears no relationship to a traditional maritime activity. The verdict, however, cannot stand because the district court erred in failing to direct the application of Idaho's comparative fault statute. The district court also erred in allowing the aviation company's owner to recover for an incidental business loss. Finally, the district court erred in admitting certain evidence of other engine shutdowns with dissimilar causes and permitting an expert to give an opinion on a question of law. The judgment of the district court is **reversed** and the case is **remanded** for a determination of whether the defendants are entitled to a new trial or judgment as a matter of law.

## II. Background

The aircraft in question was a Pilatus PC–12/45 single engine turboprop with an engine manufactured by Pratt & Whitney Canada Corporation ("Pratt & Whitney"). Pratt & Whitney is a Canadian company and the engine was designed and manufactured in Canada. The engine was then shipped to Switzerland where Pilatus, a Swiss company, installed it.

The airplane was sold to Pilatus Business Aircraft, Ltd. ("Pilatus Colorado"), a Colorado-based subsidiary of Pilatus. Pilatus Colorado then sold the airplane to Western Aircraft, Inc., its regional distributor located in Boise, Idaho. The purchase agreement between Pilatus Colorado and Western Aircraft stated the sale would be governed by Colorado law.

Western Aircraft then sold the airplane to Donald Simplot, a resident of Boise, Idaho. Simplot was the principal for DJS Aviation, LLC, a company located in Boise, Idaho. The purchase agreement for this sale stated the agreement would be governed by Idaho law. DJS Aviation leased the airplane to Access Air, a company also located in Boise. The lease agreement stated the lease would be governed by Idaho law.

In 2001 members of the Japanese Aircraft Owners and Pilots Association ("the Association") planned a trip around the world in single-engine airplanes. The Association is a fraternal organization that promotes aviation. The purpose of the trip was flight evaluation and demonstration. Three members of the Association decided to make the trip in a Pilatus PC–12. They contacted Access Air in Boise and arranged to charter the airplane for a trip that would begin and end in Boise. Because the purpose of the trip was aircraft evaluation, the itinerary included a visit to the Pilatus factory in Switzerland. The pilot for the trip was Michael Smith, an employee of Access Air.

The trip began as planned, and in a series of flights the group crossed North America, Europe, Africa, and Asia. After a stop in Hakodate, Japan, the airplane took off for Magadan, Russia. Over an hour into the flight, Smith felt a vibration in the airplane and heard a whining noise.

Shortly thereafter he felt the engine intermittently surging. Sensing possible engine failure, Smith followed the pilot operating handbook's procedure for "Emergency Failure." Smith moved the power control lever forward, thereby increasing the power, to gain control of the engine. The engine did not respond to the increase in power. Following the procedure in the handbook, Smith moved the power control lever to full forward and then began moving the manual override lever forward. The manual override lever bypasses the engine's fuel control unit and allows the pilot to manually increase the flow of fuel to the engine. As he was moving the manual override lever forward, Smith noticed the engine's interstage turbine temperature was 1144 degrees Celsius, well over the engine's temperature limit of 760 degrees. Temperatures above 1000 degrees normally cause damage to the engine. The engine also began making loud "popping and grinding noises" when he reduced the power.

When Smith saw the temperature reading, he determined the engine had failed. At that point he shut down the engine and the propeller came to an immediate stop. While preparing for an emergency landing, Smith tried to restart the engine. The propeller remained in a fixed position and Smith ceased his attempts to restart the engine. Smith then guided the plane to a crash landing in the Sea of Okhotsk. No one was seriously injured. The passengers evacuated in a life raft and were rescued by a passing Russian freighter.

The airplane sank and was never recovered. Onboard the plane and lost forever were a handful of items belonging to Paul Leadabrand, a co-owner of Access Air. These items included, among other things, a pair of sunglasses, music CDs, and leather binders. The total value of Leadabrand's lost property was $601.14. Leadabrand also paid $2422.21 for Smith's transportation back to the United States. These expenditures were part of the insurance claim filed by Access Air.

U.S. Aviation Underwriters, Inc. ("Underwriters") insured the crashed airplane. After paying Access Air for its loss, Underwriters exercised its right of subrogation and brought this suit in 2001 in the United States District Court for the District of Colorado against, inter alia, Pratt & Whitney and Pilatus. In the same action, Leadabrand also brought a claim for personal losses caused by the crash. The complaint contained claims under Colorado law based upon strict product liability and negligence. Before trial, the plaintiffs abandoned their negligence claims. Pratt & Whitney and Pilatus argued the case should be governed by admiralty law and, under either admiralty law or Colorado law, the claims were barred by the economic loss rule. The district court concluded the claimed losses were barred by neither Colorado's nor admiralty's economic loss rule. The district court also concluded admiralty law did not govern the case.

In the pretrial order, Underwriters alleged liability due to defective design, defective manufacture, and failure to warn. Defendants listed among their defenses that "[t]he plaintiffs are barred from recovery for the loss of the aircraft by the economic loss rule either under Admiralty law, Idaho law or Colorado law." They also asserted that "Idaho law applies to the scope of the contractual duties between the aircraft owner and the defendants and to their comparative responsibilities in this case."

About five months before trial, Pilatus filed a motion urging the court to apply Idaho's comparative fault statute. Idaho prohibits recovery in product liability cases when the plaintiff bears greater responsi-

bility for the injury than the defendant. Idaho Code Ann. § 6–1404. Colorado has no such prohibition. Colo.Rev.Stat. § 13–21–406(1). In a minute order, the district court denied the motion. The order stated, in full:

> Pilatus Defendants' Motion in Limine re Idaho Law [ ] is DENIED. A review of the record and the transactions resulting in the sale of the subject aircraft, in Colorado, to an Idaho entity pursuant to the terms of a purchase agreement stipulating that the sale would be governed by Colorado (not Idaho) law, together with other justified expectations that have accrued over the six years this case has been pending that Colorado law would apply, make a change at this late date from Colorado's comparative fault scheme to Idaho's unnecessary and improvident. The scheduled June 2007 trial of [Underwriters]'s now six-year-old tort claims will proceed under Colorado, rather than Idaho, law.

Pilatus also filed two motions in limine relevant to this appeal. First, it filed a motion seeking to exclude evidence of in-flight engine shutdowns in other Pilatus airplanes. It argued the incidents were significantly dissimilar to this case because those shutdowns resulted from mechanical failures different from the failure alleged by Underwriters. The district court denied the motion, stating it would "entertain whatever appropriate objections are raised during the normal course of trial as to the admissibility of such evidence under the specific circumstances presented." Pilatus also moved to prevent one of Underwriters's experts, W. Jeffrey Edwards, from testifying that the pilot operating handbook failed to comply with applicable Federal Aviation Regulations. It argued Edwards could not express an opinion on an issue of law because he would be supplanting the court as the interpreter of law. This motion was denied as well.

The case went to trial, and a jury returned a verdict in favor of the plaintiffs, although it found the plaintiffs were 51% at fault. Pursuant to the Colorado comparative fault statute, Colo.Rev.Stat. § 13–21–406(1), the district court entered judgment in favor of the plaintiffs for 49% of the stipulated damages. Pilatus and Pratt & Whitney appeal.

## III. Discussion

### A. Admiralty Jurisdiction

■ Pilatus and Pratt & Whitney contend the district court erred in rejecting the application of admiralty jurisdiction and admiralty law's economic loss rule, which would bar this suit for economic losses. The basis for federal jurisdiction is a question of law to be reviewed de novo. *In re Natural Gas Royalties,* 562 F.3d 1032, 1038 (10th Cir.2009). The findings of fact underlying this determination are reviewed for clear error. *Dahl v. United States,* 319 F.3d 1226, 1228–29 (10th Cir. 2003).

The Supreme Court first addressed the question of admiralty jurisdiction over aviation torts in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). In *Executive Jet,* an airplane took off from an airport in Cleveland, Ohio, bound to pick up passengers in Portland, Maine for a charter flight to White Plains, New York. *Id.* at 250, 93 S.Ct. 493. Shortly after takeoff, the plane's engines ingested seagulls, causing an almost total loss of power. *Id.* The plane crash-landed and came to a stop on the surface of Lake Erie. *Id.* The question before the Court was whether admiralty jurisdiction governed the ensuing tort suit. *Id.* at 253, 93 S.Ct. 493. The Court answered that question in the negative. *Id.* at 272–74, 93 S.Ct. 493. It began by noting admiralty jurisdiction traditionally depended upon whether the wrong occurred

on navigable waters. *Id.* at 253, 93 S.Ct. 493. The *Executive Jet* Court rejected the strict locality test for aviation torts because under that test the jurisdictional question turned on the "wholly fortuitous" question of whether the plane happened to be flying over water at the time of the accident. *Id.* at 267–68, 93 S.Ct. 493. As a consequence, the Court concluded it would not apply admiralty jurisdiction to aviation torts unless the harm occurs on or over navigable waters and the "wrong bear[s] a significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. 493. The Court went on to conclude there is no relationship to a traditional maritime activity when a plane is land-based and flies between two points in the continental United States. *Id.* at 272, 93 S.Ct. 493. The Court left open the question whether aviation torts could ever sound in admiralty. *Id.* at 271, 93 S.Ct. 493.

The *Executive Jet* test for admiralty jurisdiction has been reaffirmed and applied outside the aviation context in later Supreme Court opinions, most recently in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). In *Grubart,* the Court explained a party seeking admiralty jurisdiction "must satisfy conditions both of location and of connection with maritime activity." *Id.* To apply the connection test, a "court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce." *Id.* (quotations omitted). Second, the court "must determine whether the general character of the

activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* (quotations omitted). This requires the court to determine "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." [1] *Id.* at 539–40, 115 S.Ct. 1043. The Court interpreted *Executive Jet* to stand for the proposition that, "in flying an airplane over the water[,] ... the relationship is too attenuated" to meet the connection test. *Id.* at 540, 115 S.Ct. 1043.

The Supreme Court also discussed the *Executive Jet* test in *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 218–19, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). One issue presented in *Offshore Logistics* was whether, following the crash of a helicopter that had been ferrying workers from an offshore drilling platform back to shore, the survivors of the deceased workers could recover under Louisiana substantive law by way of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356a, in addition to the admiralty law remedy available under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 30301–30308. *Offshore Logistics,* 477 U.S. at 209, 106 S.Ct. 2485. The Court concluded the OCSLA remedy was unavailable, and it provided several reasons for so holding. *Id.* at 218–20, 106 S.Ct. 2485. First, the Court noted the accident occurred on the high seas, far away from any man-made structure, and by its own terms OCSLA does not apply in such areas. *Id.* at 218, 106 S.Ct. 2485.

---

1. The *Grubart* Court made clear the term "tortfeasor's activity" includes the potentially wrongful activities of all parties, not simply defendants. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 541, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). If the activities of any one putative tortfeasor are substantially related to a traditional maritime activity, this prong of the jurisdictional test is satisfied. *Id.* The only activity alleged in this case to be related to maritime activity is flying the plane over navigable waters.

Second, the Court concluded OCSLA was not intended to apply in places where admiralty law applied. *Id.* at 218–19, 106 S.Ct. 2485. This foreclosed the OCSLA claim because admiralty law was expressly applicable under DOHSA. *Id.* at 218, 106 S.Ct. 2485. The Court also stated that, in the absence of DOHSA, admiralty law would still be applicable under the *Executive Jet* test because the "helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an 'island,' albeit an artificial one, to the shore." *Id.* at 218–19, 106 S.Ct. 2485.

In this case, the issue is whether the flight had an adequate connection to maritime activity. To resolve this, the court must first determine "whether the incident has a potentially disruptive impact on maritime commerce." *Grubart,* 513 U.S. at 534, 115 S.Ct. 1043 (quotations omitted). Second, this court must determine whether the activity has a substantial relationship to traditional maritime activity. *Id.* There is a substantial relationship to traditional maritime activity when the activity "is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Id.* at 539–40, 115 S.Ct. 1043. For purposes of analysis only, this court will assume the crash was likely to interfere with maritime activity, thus satisfying the first prong of the connection test. The remaining question is whether the activity is "so closely related to activity traditionally subject to admiralty law" that admiralty law should be applied. *Id.*

Pilatus and Pratt & Whitney argue *Offshore Logistics* controls the outcome because that case found admiralty jurisdiction in a helicopter crash between an island and the mainland, and here the airplane crashed en route between an island and a mainland. They note a number of lower courts following *Offshore*

*Logistics* have applied admiralty jurisdiction in aviation tort cases and urge this court to adopt a "but-for" test for admiralty jurisdiction: if a plane's voyage would not be possible but for the crossing of navigable waters, then admiralty jurisdiction applies.

*Offshore Logistics* did not create the but-for rule urged by Appellants. The ferrying of workers between the rig and the mainland was a necessity for the oil company in that case. The employees were transported to and from a site on the high seas for the sole purpose of engaging in mineral extraction. Whatever the means of conveyance, the purpose of the trip was to enable workers to extract minerals from beneath the high seas. Because the very purpose of the trip was intertwined with its locale on the high seas, it made sense for the Supreme Court to conclude ferrying workers to and from an oil rig bore a substantial relationship to a traditional maritime activity.

█ This court is not willing to make the leap, urged by Appellants, to conclude all air travel between an island and a mainland automatically invokes admiralty jurisdiction. The substantial relationship test developed from the Supreme Court's dissatisfaction with the bright-line locality rule then in place. *Executive Jet,* 409 U.S. at 265–68, 93 S.Ct. 493. The resulting test is, unsurprisingly, nuanced: admiralty jurisdiction should cover only activities so closely related to traditional maritime activities that the reasons for applying special admiralty rules should predominate. *Grubart,* 513 U.S. at 539–40, 115 S.Ct. 1043. The test may sometimes be difficult to apply. *See id.* at 549–54, 115 S.Ct. 1043 (Thomas, J., concurring) (criticizing the substantial relationship test as "ambiguous" and advocating a return to a "bright-line" situs test). Congress has passed bright-line statutes governing the applica-

tion of admiralty law in certain circumstances. *See, e.g.,* 46 U.S.C. § 30307 (creating admiralty wrongful death cause of action for commercial aviation accidents occurring on the high seas beyond twelve nautical miles from the shore of the United States); 43 U.S.C. § 1333(a)(2)(A) (requiring the application of state civil and criminal law on artificial structures erected on the subsoil and seabed of the outer Continental Shelf). In the decades following *Executive Jet,* however, Congress has not seen fit to pass a specific statute extending or rejecting admiralty jurisdiction for aviation accidents over water, leaving courts to apply *Executive Jet* on a case-by-case basis to determine the applicability of the general admiralty jurisdiction statute, 28 U.S.C. § 1333.

■ The test is not so difficult to apply in this case. As the district court recognized, the only connection with maritime activity is the airplane's crash into water. There are no other reasons for applying special admiralty rules. The trip was undertaken by airplane enthusiasts for the express purpose of aircraft evaluation and demonstration. The district court found the trip was a promotional excursion, and this finding is not challenged by Defendants. If an airplane had not been available, the trip would never have happened. This flight was thus not at all related to any traditional maritime activity. No special admiralty rules are needed to fairly adjudicate the issues in this aviation tort case. A crash in international waters is all that suggests admiralty jurisdiction and *Executive Jet* rejected the application of admiralty jurisdiction based merely on the fortuitous location of the crash. 409 U.S. at 267–68, 93 S.Ct. 493. Because the activity of flying an airplane for no other reason than promoting and demonstrating the airplane is unrelated to any traditional maritime activity, it does not give rise to admiralty jurisdiction.

This result is not in conflict with the decisions of other circuits applying admiralty jurisdiction to aviation torts. This court need not decide whether air travel taken for no purpose other than to deliver persons or cargo to a different land mass is enough to invoke admiralty jurisdiction. In this case, unlike the cases where circuit courts have applied admiralty jurisdiction, the undisputed purpose of the flight was evaluating and demonstrating the airplane. Had the airplane been unavailable, the trip would not have taken place. This case is thus distinguishable from cases involving the transportation passengers between a mainland and an island. *See, e.g., Preston v. Frantz,* 11 F.3d 357, 359 (2d Cir.1993) (applying admiralty law to the crash of a helicopter ferrying passengers between mainland and Nantucket Island); *Miller v. United States,* 725 F.2d 1311, 1315 (11th Cir.1984) (applying admiralty law to passenger flight between the Bahamas and Florida); *Williams v. United States,* 711 F.2d 893, 896 (9th Cir.1983) (applying admiralty law to passenger flight from California to Hawaii); *Ledoux v. Petroleum Helicopters, Inc.,* 609 F.2d 824, 824 (5th Cir.1980) (per curiam) (applying admiralty law to the ferrying of oil rig workers to and from the mainland). *But see Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.,* 449 F.3d 85, 86, 88 (1st Cir.2006) (concluding crash of passenger airplane traveling between islands presented "an unresolved question as to whether admiralty jurisdiction should apply, and the Supreme Court's precedents on this issue have not been entirely clear."). This case is also distinguishable from a case involving the transoceanic transportation of cargo. *Roberts v. United States,* 498 F.2d 520, 524 (9th Cir.1974) (suggesting *Executive Jet* would not preclude admiralty jurisdiction in cargo transportation setting). Because the activity in this case lacked a substantial relationship to traditional mari-

time activity, the district court did not err in refusing to apply admiralty law.

### B. Idaho Law

Pilatus argues the district court erred in not applying Idaho substantive law. It further claims it is entitled to judgment as a matter of law on two separate grounds under Idaho law: first, on the basis of Idaho's economic loss rule, and second, on the basis of Idaho's comparative fault statute. Underwriters responds by arguing Pilatus never asked the district court to apply Idaho's economic loss rule, and that the district court did not plainly err in refusing to apply it. It also argues that under Colorado's choice of law rules, the district court correctly decided to apply Colorado's comparative fault statute.

### 1. Idaho's Economic Loss Rule

Pilatus acknowledges it never specifically asked the district court to apply Idaho's economic loss rule. It only asked the district court to apply admiralty law's economic loss rule, which it claims is equivalent to Idaho's economic loss rule. In a pretrial ruling, the district court concluded admiralty law's economic loss rule would not bar the suit. Pilatus contends the district court would have ruled the same way with respect to the Idaho economic loss rule. Pilatus saw no purpose, therefore, in asking the district court to apply an identical rule based in Idaho law.

Pilatus also claims the issue was preserved in the pretrial order, which contained Pilatus's contention that "Idaho law applies to the scope of the contractual duties between the aircraft owner and the defendants and to their comparative responsibilities in this case." Pilatus further claimed that "[P]laintiffs are barred from recovery for the loss of the aircraft by the economic loss rule either under Admiralty law, Idaho law or Colorado law."

An issue is not preserved for appeal unless a party "alerts the district court to the issue and seeks a ruling." *Ecclesiastes 9:10–11–12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1141 (10th Cir.2007). A party does not preserve an issue merely by advancing a related theory before the district court, or by presenting the issue to the district court in a "vague and ambiguous" manner. *Id.* (quotation omitted). Nor may a party preserve an argument by making a "fleeting contention" before the district court. *Tele–Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233–34 (10th Cir.1997).

The references in the pretrial order to Idaho's economic loss rule are little more than fleeting contentions and are not sufficient to preserve the issue for appellate review. Pilatus never asked the district court for a ruling on whether Idaho's economic loss rule applied, and the references in the pretrial order contain no legal argument upon which the district court could have relied in deciding the question.

Pilatus's argument that Idaho's economic loss rule is identical to the admiralty law rule is speculative and illustrates the necessity of providing district courts with the opportunity to rule on issues by presenting full legal arguments. The district court's rejection of admiralty's economic loss rule was based upon a close reading of a Supreme Court admiralty case, *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Idaho's economic loss rule is a creature of Idaho's common law and its application depends upon an analysis of Idaho case law. While Pilatus believes Idaho law and admiralty law have the same economic loss rule, it never gave the district court the opportunity to determine whether that is so. Because Pilatus is asking for reversal on grounds never presented to the district

court, its argument must be reviewed only for plain error. *Ecclesiastes,* 497 F.3d at 1142. Under the plain error standard, Pilatus has the high burden of demonstrating, *inter alia,* the alleged error resulted "in a miscarriage of justice that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1143 (quotation omitted). Assuming *arguendo* the district court erred in not applying Idaho's economic loss rule, Pilatus has failed to make any showing suggesting this failure resulted in a miscarriage of justice. Therefore, the district court's failure to apply Idaho's economic loss rule does not warrant reversal.[2]

#### 2. Idaho's Comparative Fault Statute

Pilatus did ask the district court before trial to apply Idaho's modified comparative fault statute, Idaho Code Ann. § 6–1404. This statute disallows recovery in product liability actions if the plaintiff bears greater responsibility for the injury than the defendants. *Id.* In the pretrial order, Pilatus indicated it planned to file a pretrial motion asserting that "Idaho law applies to the scope of the contractual duties between the aircraft owner and the defendants and to their comparative responsibilities in this case." The pretrial order also contained Pilatus's contention that "the negligence of Access Air and its employee, pilot Smith, caused the accident, and that their negligence comparatively bars or reduces plaintiffs' damages." Pilatus also submitted proposed jury instructions consistent with Idaho's comparative fault statute. Before trial, Pilatus filed a motion in limine seeking the application of Idaho's comparative fault statute. The motion was fully briefed on both sides. In a minute order, the district court denied the motion. The jury ultimately returned a verdict finding Plaintiffs 51% at fault.

■■■■■ Choice of law questions involving undisputed facts are reviewed de novo. *Anderson v. Commerce Const. Servs.,* 531 F.3d 1190, 1193 (10th Cir.2008). A federal court applies the choice of law rules of the state in which the district court sits. *Id.* Colorado follows the "most significant relationship" test from the Restatement (Second) of Conflict of Laws to determine choice of law questions in tort cases. *AE, Inc. v. Goodyear Tire & Rubber Co.,* 168 P.3d 507, 509–10 (Colo.2007). Under § 145 of the Second Restatement, the law to be applied is the "law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1) (1971). The most significant relationship is determined by applying the following principles:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* §§ 6(2), 145. In applying these principles, courts must take the following contacts into account:

(a) the place where the injury occurred,

---

**2.** As the issue was not briefed, this court expresses no opinion on whether, if there is a new trial after remand, Pilatus can request the application of Idaho's economic loss rule before the district court.

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2). These contacts vary in relative importance depending upon the issue at hand. *Id.*

The district court decided to apply Colorado law because (1) there was a purchase agreement between Pilatus Colorado and the Idaho distributor that Colorado law would govern the contract, and (2) the parties had "justified expectations" that Colorado law would apply as a result of six years of litigation under Colorado law. Pilatus argues the contract cited by the district court is almost entirely irrelevant to the issues of the case. Further, it argues the "justified expectations" the Restatement seeks to protect are pre-litigation expectations in contract cases, not post-filing expectations arising during the litigation. Pilatus contends Idaho law governs the question of comparative fault because the planning of the flight in Idaho was a more direct cause of the accident than any conduct occurring in Colorado and Idaho residents are more central to the case than the lone Colorado entity.

■ Reviewing the relevant factors, Idaho has the most significant relationship to the incident. The accident occurred over international waters and the airplane was manufactured and designed in Canada and Switzerland, so neither the place of the accident nor the conduct of the defendants favors one state over the other. The conduct and residency of the plaintiffs weigh in favor of applying Idaho law. The trip was arranged and conducted by an Idaho company. The plane and pilot were based in Idaho. The only connection with Colorado is Pilatus Colorado's temporary ownership of the airplane before its resale to an Idaho distributor. Pilatus Colorado's conduct is not relevant to this lawsuit, and thus Colorado has little, if any, interest in the outcome. Idaho, on the other hand, has an interest in the safety and conduct of its citizens, whose actions are of central importance in this case.

The contract for Pilatus Colorado's sale of the airplane to the Idaho distributor did state Colorado law would apply to disputes under the contract. To the extent this contractual choice of law provision is relevant at all to the question of which state's tort rules should apply, however, it is outweighed by the contracts governing the airplane's subsequent sale and lease, both of which stated Idaho law would apply.

The district court also concluded the Restatement's protection of justified expectations favored Colorado law because the parties had litigated the case under Colorado law up to that point. The parties did focus their arguments on Colorado law for much of the pretrial proceedings, but this is unsurprising because Underwriters brought suit under Colorado law. Pilatus argued before trial that the suit failed under Colorado's economic loss rule and contended it was entitled to summary judgment under Colorado law. Had the district court accepted these arguments, there would have been little reason to invoke the law of another jurisdiction. Pilatus also raised the issue of admiralty law early in the litigation, and it would have had no reason to invoke Idaho law had the district court applied admiralty law.

The Restatement's commentary explains the "protection of justified expectations" principle primarily refers to the expectations of parties in their pre-litigation conduct, and this principle is of little or no importance in the field of torts. Restatement (Second) of Conflict of Laws §§ 6 cmt. g, 145 cmt. b. Plaintiffs cite no case law applying this principle to expectations

accrued after litigation has begun. Such expectations deserve to be protected, and they are protected by way of the district court's power to set deadlines for motions. *See* Fed.R.Civ.P. 16(b). They are not, however, the types of interests protected by choice of law rules, which are designed to determine the applicable body of law when the events underlying a lawsuit have connections with more than one state. Restatement (Second) of Conflicts of Laws § 1.

 Underwriters also argues Pilatus effectively waived its ability to invoke Idaho law based upon its answers to interrogatories. In its interrogatory, Underwriters asked Pilatus, "Do YOU contend that the claims against YOU in this lawsuit are governed by the law of a state or jurisdiction other than Colorado?" Pilatus responded that it "did not allege in its answer and does not contend *at this time* that the law of a state or jurisdiction other than Colorado governs this action against it" (emphasis added). Underwriters contends Pilatus was under an ongoing duty under Fed.R.Civ.P. 26(e)(1)(A) to amend its answers in a timely manner. If a party fails to provide information required by Fed.R.Civ.P. 26(e)(1)(A), the party is prohibited under Fed.R.Civ.P. 37(c)(1) from using that information at trial. Thus, Underwriters argues that because Pilatus failed to accurately disclose its intention to invoke Idaho law, it is prohibited by Fed. R.Civ.P. 37(c)(1) from actually invoking Idaho law.

We reject this argument because we discern no violation of Fed.R.Civ.P. 26(e)(1)(A). Pilatus notified Underwriters of its intent to rely upon Idaho law by stating as much in the pretrial order. Fed.R.Civ.P. 26(e)(1)(A) does not require amended interrogatories in all circumstances, but only when "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." The pretrial order was written notice to all parties, including Underwriters, of Pilatus's position, and Pilatus was not foreclosed from filing its motion to apply the Idaho comparative fault statute.

 Because the jury returned a special verdict apportioning 51% of the fault to the plaintiffs, and Idaho law prohibits recovery when the plaintiffs bear greater responsibility for the injury than the defendants, Pilatus contends this court can remand with instructions to enter judgment as a matter of law in its favor. When a district court enters a judgment with a legally insufficient basis, this court has three options: (1) order the entry of judgment as a matter of law, (2) order a new trial, or (3) remand to the district court to decide the appropriate option. *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1254 (10th Cir.1999). Underwriters argues that judgment as a matter of law is inappropriate because under Idaho law the jury may be instructed on the effect of the modified comparative fault statute. *Seppi v. Betty*, 99 Idaho 186, 579 P.2d 683, 692 (1978). Had the district court directed application of Idaho's comparative fault statute, Underwriters argues it would have requested an instruction on the effect of the statute, and such an instruction may well have changed the jury's verdict. In *Seppi*, the Idaho Supreme Court held it was not reversible error for a jury to be instructed on the effect of apportioning 50% or more of the fault to the plaintiff. *Id.* In so doing, it expressed the view that juries are usually interested in whether their factual findings "will effectuate a result in accord with their own lay sense of justice." *Id.* at 690. It stated that failing to instruct a jury on the effect of its verdict would not eliminate the jury's tendency to try to tailor its findings to reach a certain result, but would instead invite legal speculation by the jury. *Id.* Under a modified com-

parative fault scheme, such speculation could easily be mistaken, leading to juries tailoring their findings based upon mistaken assumptions regarding Idaho law. *Id.* at 690–91. The Idaho Supreme Court concluded, "in most cases [an instruction on the effect of the verdict] is fully warranted," but trial courts have the discretion to not give an instruction "in those cases where the issues are so complex or the legal issues so uncertain that such instructions would confuse or mislead the jury." *Id.* at 692.

We express no opinion whether, under Idaho law, it would have been appropriate to instruct the jury on the effect of its verdict. That determination should be made by the district court in the first instance. If, on remand, the district court determines the issues are so complex that an instruction on modified comparative fault would have confused or misled the jury, entry of judgment as a matter of law in favor of the defendants is appropriate. If the district court determines otherwise, a new trial is necessary. Idaho has expressed its view that instructions regarding the operation of a modified comparative fault scheme affect the jury's deliberations. *Id.* at 690–91. It is impossible, therefore, to conclude the jury would have reached the same result had it received the instruction. We address the remaining claims on appeal that are likely to recur in the event the district court orders a new trial.

### C. Leadabrand's Claims

Both Pilatus and Pratt & Whitney argue the district court erred in refusing to dismiss Leadabrand's claim for the value of his lost property. Pratt & Whitney moved for summary judgment on Leadabrand's claim on the grounds that he was not the real party in interest. It argued he was reimbursed by Access Air, which in turn was reimbursed by Underwriters. The district court did not specifically rule on Leadabrand's claim, but instead ruled that the "[p]laintiffs may maintain their tort claims against Defendants.... Liability would be limited to the value of the lost aircraft, and would not include recovery for commercial or business loss." Pratt & Whitney reiterated the argument in a motion for reconsideration and the district court denied the motion without specifically addressing Leadabrand's claim.

The fact of Leadabrand's reimbursement, without more, does not bar his recovery. He is permitted to recover under Colorado's collateral source rule so long as the collateral payment was made "as a result of a contract entered into and paid for by or on behalf of" Leadabrand. Colo.Rev.Stat. § 13–21–111.6. Defendants do not attempt to argue the insurance contract between Access Air and Underwriters falls outside the scope of this provision. They do argue the assignment of Access Air's claims to Underwriters prohibits Leadabrand from bringing this action. Although this assignment is not in the record, it presumably grants Underwriters the right to sue for Leadabrand's loss. Defendants, however, have not shown the assignment affirmatively prevents Leadabrand from bringing his own action in the event Underwriters declines to do so. That is effectively what happened: Underwriters seeks to recover only the value of the airplane while Leadabrand is seeking to recover the value of his personal property. Underwriters is a party to this suit and will be bound by its result, so there is no threat of double recovery. As a consequence, there is little sense in this court preventing Leadabrand from seeking to recover the value of his property.

Defendants also argue Leadabrand's claims are barred by the district court's pretrial ruling that damages would be limited to the value of the lost aircraft. Before trial, the district court ruled the

suit was not barred by the economic loss rule. It limited the damages recoverable to the "value of the lost aircraft," and did not allow for recovery of commercial or business loss. Although the district court did not explicitly give a reason for so limiting the damages, it followed Colorado law on the matter. *See Hiigel v. Gen. Motors Corp.*, 190 Colo. 57, 544 P.2d 983, 989 (1975) ("[W]e decline to extend the doctrine of [strict product liability] to commercial or business loss."). After this ruling, Pratt & Whitney filed a motion for reconsideration in which it sought, *inter alia*, dismissal of Leadabrand's claims. The motion was denied in a minute order without mention of Leadabrand's claims.

We decline to read the district court's ruling as narrowly as Defendants suggest. Pratt & Whitney and Pilatus cite no particular legal rationale for why recovery in a products liability action should be limited to the value of the aircraft and should not include property onboard the aircraft. *See* Colo.Rev.Stat. § 13–21–401(2) (" 'Product liability action' means any action brought against a manufacturer or seller of a product ... for or on account of personal injury, death, or *property damage. ...*" (emphasis added)). Leadabrand's lost personal items, valued at $601.14, qualify as "property" and therefore the district court would have had no basis to exclude recovery under Colorado law. The airplane ticket valued at $2422.21, however, was not property subject to damage. It was purchased only as a consequence of the airplane crash. As such, it falls within the definition of a commercial or business loss and should have been excluded from damages in accordance with the district court's ruling on business losses, which is not challenged on appeal.

## D. *Evidence of In–Flight Shutdowns*

Pilatus argues the district court erred in allowing testimony and exhibits regarding other in-flight shutdowns of engines on Pilatus airplanes. It argues the other events were dissimilar to this incident, and the evidence was therefore irrelevant and highly prejudicial. The evidence in question is a series of internal corporate documents and associated testimony discussing multiple incidents involving engine malfunctions on Pilatus aircraft. Pilatus argues none of the other incidents were caused by defective power turbine blades, and the incidents are therefore not admissible to demonstrate a defect in this case.

■ Underwriters claims this argument was not preserved for appellate review because Pilatus failed to make detailed objections when the evidence was admitted. A review of the record reveals this contention is without merit. In a pretrial ruling, the district court stated it would wait to rule on the objection until it was raised at trial. Once the trial was underway, Pilatus indicated its intent to object to the evidence and the district court held a conference to address the objection. At conference, Pilatus argued the other incidents were "not in any way related to the alleged defect." It also argued Underwriters needed to prove, as a predicate to admissibility, "that there's some similarity in these incidents." The district court overruled Pilatus's objection, stating, "[i]f they don't show [similarity], you can bring it out on cross examination, that's what it's for." This conference was sufficient to preserve the substantial similarity issue for appeal. The parties argued, and the district court definitively ruled on, the precise objection raised on appeal.

■ A district court's decision to admit evidence is reviewed for abuse of discretion. *United States v. Caldwell*, 560 F.3d 1214, 1220 (10th Cir.2009). In product liability cases, evidence of

other accidents is admissible if the other incidents are "substantially similar" to the incident in question. *Wheeler v. John Deere Co.,* 862 F.2d 1404, 1407 (10th Cir.1988). The degree of similarity required varies depending on how the evidence is used. *Id.* at 1407–08. "Evidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury. The requirement is relaxed, however, when the evidence of other accidents is submitted to prove notice or awareness of the potential defect." *Id.*

Underwriters argues the evidence is relevant for several reasons. First, it argues the accident in this case was caused by an in-flight shutdown, and therefore some of the exhibits are relevant to show the likelihood of in-flight shutdowns. It also argues one exhibit is relevant to attack the credibility of the defendants because it shows a deliberate strategy of pinning blame on the pilot.[3]

■ The first exhibit, Exhibit 103, is an e-mail between Pilatus officials written after an accident involving a PC–12 aircraft. In the e-mail, one Pilatus official states: "For marketing purposes, we should question the pilot, the maintenance and anything which is not engine or airframe related. If engine or installation are in question, the PC–12 is dead!" Underwriters argues this e-mail demonstrates a deliberate strategy on the part of Pilatus to blame the pilot in all cases, and is thus relevant to the credibility of Pilatus's theo-

ry of comparative negligence on the part of the pilot. The district court did not abuse its discretion in admitting this exhibit. Evidence regarding the credibility of a party is certainly relevant, and neither defendant contends the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Fed.R.Evid. 403.

■ Exhibits 105, 106, 108, 109, and 113 were all admitted to show this airplane had a high rate of in-flight engine shutdowns. The challenged exhibits are described in greater detail below.

(1) Exhibit 105 consisted of letters from two Pilatus vice presidents written to the Chairman and President of Pratt & Whitney. The letters express concern regarding the quality of Pratt & Whitney engines in light of multiple performance problems, including in-flight shutdown incidents.

(2) Exhibit 106 was a letter from the President of Pilatus to the President of Pratt & Whitney written several weeks after the accident in this case. Like Exhibit 105, this letter expresses concern regarding multiple in-flight shutdowns. In discussing the incident in this case, it states: "investigations are just starting but already we know that loss of propulsion was the cause. Due to the sinking of the aircraft we may never know if or how engine failure was to blame. However, to the rest of the world this is just another instance of a PC–12 with an engine in flight shutdown." The letter also requests that Pratt & Whitney address the perceived problems with its engines.

---

**3.** Underwriters also argues the prior incidents demonstrate knowledge of the likelihood of engine shutdowns during flight, which was relevant because Pilatus was relying upon a "product misuse" affirmative defense, and foreseeability was relevant to the defense. The substantial similarity test is relaxed when evidence is used to prove notice of an alleged defect rather than the defect itself. *Wheeler v.*

*John Deere Co.,* 862 F.2d 1404, 1407–08 (10th Cir.1988). The record clearly indicates, however, Pilatus and Pratt & Whitney proposed withdrawing the defense prior to the admission of these exhibits so there would be no issue of foreseeability. The evidence was therefore not admissible to show notice of a defect.

(3) Exhibit 108 is a slide prepared by Pilatus for a senior management meeting listing thirteen incidents, including five incidents listed as actual or potential in-flight shutdowns. The slide also states the rate of in-flight shutdowns is higher than the target rate.

(4) Exhibit 109 is the minutes of a meeting between Pilatus and Pratt & Whitney regarding in-flight shutdowns. The minutes indicate a discussion of the in-flight shutdown rate and overall engine quality concerns.

(5) Exhibit 113 is a "Coordination Memo" summarizing a meeting between Pilatus and Pratt & Whitney executives. The memo contains several statements regarding the number of in-flight shutdowns to date.

The incidents described in these exhibits do not meet the substantial similarity test. The only potential causes of this crash alleged by Underwriters are: (1) a power turbine blade failure, (2) a failure to warn the pilot against engaging the manual override lever while the power control lever was full forward, and (3) a failure to warn the pilot against an abrupt shutdown of an overheated engine.[4] Underwriters did not claim the accident was caused by generally defective workmanship or a design defect. Based on the information in the exhibits themselves, none of the other incidents involved any of the causes alleged by Underwriters. The proponent bears the burden of establishing admissibility. *See United States v. Crockett,* 435 F.3d 1305, 1311–12 (10th Cir.2006). The only similarity suggested by Underwriters is that all the incidents involve in-flight shutdowns and the evidence is thus relevant to show this aircraft is prone to in-

flight shutdowns. Other in-flight shutdowns are only relevant to this case if they are caused by similar defects. The other incidents say nothing about the likelihood of a power turbine blade failure, the misuse of the manual override lever, or the shutdown of an overheated engine.

Exhibit 106 includes a statement citing the present incident as "just another instance of a PC–12 with an engine in flight shutdown." Underwriters argues this is an admission by Pilatus regarding similarity. The statement, however, is merely a generalized concern regarding public perception of the number of in-flight shutdowns. It was made shortly after the crash and the letter clearly states Pilatus does not yet know the reason for the loss of propulsion that caused the crash. This statement falls short of being an admission by Pilatus that this crash had a cause similar to other incidents.

■■ The district court abused its discretion in allowing evidence of these other in-flight shutdowns to be presented without any showing that they had similar causes to the accident in question. Evidentiary errors are not grounds for reversal unless the aggrieved party shows the admission of the evidence was not harmless. *Perkins v. Silver Mountain Sports Club & Spa, LLC,* 557 F.3d 1141, 1146–47 (10th Cir.2009). Because reversal is required by the district court's failure to apply the Idaho comparative fault statute, it is unnecessary to reach the question of whether the admission of this evidence alone warrants reversal.

*E. Evidence Regarding Compliance with Federal Aviation Regulations*

The FAA mandates that "[it] must be possible to restart an engine in flight.

---

4. Engine overheating and an abrupt shutdown were suggested by the defense as possible explanations for the engine failure that led to the crash. Underwriters argued those the-

ories supported a liability finding because the pilot operating handbook failed to warn against the pilot taking those actions.

**1150**

Any techniques and associated limitations must be established and included in the Airplane Flight Manual, approved manual material, or applicable operating placards." 14 C.F.R. § 23.903(e)(3). Underwriters contends Pilatus violated this regulation because the pilot operating handbook failed to properly instruct users on how to restart the engine.[5] The jury was instructed on the regulation and Underwriters elicited testimony from an expert, Edwards, regarding the regulation. On direct examination, Edwards was asked if he had determined "whether the Pilot Operating Handbook [ ] for the PC–12/45 [aircraft] would have complied with the Federal Aviation Regulations." Over Pilatus's objection, Edwards responded, "Yes, I did." The examination proceeded as follows:

Q. And could you give an example of why that is so.

A. Well, the regulation says that there should be a procedure that allows for the engine to be shut down and restarted in flight.

Q. Okay. And as we know from the facts in this case that was not possible. Okay....

Edwards revisited the subject later in his testimony:

Q. You say you should be able to restart it. Is there a specific requirement that says that you should be able to restart an engine?

A. Yes, there is.

Q. And what is that FAR?

A. It's in Part 23, which governs small aircraft and it's at Section 903, which governs turbine engines for single engine airplanes.

Q. So is it your opinion he should have been able to restart the engine?

A. Correct.

Finally, at the close of Edwards's testimony, he was asked, "Based on your experience and background and the research you've done, it's your opinion that the FARs require that [the] engine be restartable, correct?" Edwards responded, "Yes."

Pilatus contends Edwards should not have testified regarding the meaning of the applicable regulations because such testimony invades the province of the court to instruct the jury on the law.[6] Expert testimony is appropriate when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. "[T]he touchstone of the admissibility of expert testimony is its helpfulness to the trier of fact." *Gust v. Jones,* 162 F.3d 587, 594 (10th Cir.1998) (quotation omitted). Expert witnesses may not testify as to ultimate issues of law governing the jury's deliberations, because instructing the jury is the function of the trial judge. *Specht v. Jensen,* 853 F.2d 805, 808 (10th Cir.1988) (en banc).

The testimony given by Edwards regarding the meaning of 14 C.F.R. § 23.903(e)(3) violated Fed.R.Evid. 702. The regulation was written in straightforward language and quoted verbatim in Jury Instruction 3.7: "It must be possible to restart an engine in flight. Any tech-

---

**5.** Underwriters does not contest the district court's ruling that this regulation applies only to Pilatus. The regulation is relevant because a violation of an applicable government standard or regulation creates a rebuttable presumption the product was defective. Colo. Rev.Stat. § 13–21–403(2).

**6.** Pilatus also argues Edwards improperly gave an opinion regarding compliance with the regulation. It is unnecessary, however, to address that issue because Edwards was never actually asked to state his opinion.

niques and associated limitations must be established and included in the airplane flight manual, approved manual material or applicable operating placards." To the extent Edwards was explaining the content of the regulation, he was merely repeating the jury instruction. Nothing about the regulation suggests explanation by an expert was required, and such testimony also violates the rule against experts testifying as to the law governing the jury's deliberations. *Specht,* 853 F.2d at 808; *see also F.A.A. v. Landy,* 705 F.2d 624, 632 (2d Cir.1983) (affirming district court's decision to exclude expert testimony about the meaning and applicability of federal aviation regulations because such testimony would "invade the province of the court to determine the applicable law and to instruct the jury as to that law"). Because the testimony regarding the meaning of 14 C.F.R. § 23.903(e)(3) violated Fed.R.Evid. 702, the district court abused its discretion in admitting it. As with the evidence of other in-flight shutdowns, it is unnecessary to determine if this error was harmless because the judgment must be reversed on other grounds.

### F. Sufficiency of the Evidence

 Pratt & Whitney argues it is entitled to judgment as a matter of law because the evidence presented was insufficient to support liability against it under either a manufacturing defect or a failure to warn theory. This argument falls short. A jury verdict can be based solely on inferences about the most likely cause of a product failure. Based upon accounts of how the engine behaved prior to the crash, Underwriters's expert David Rupert developed a theory that the most likely cause of the malfunction was a power turbine blade defect. Rupert determined other possible causes were less likely. If the jury believed his opinion, it could have decided a power turbine blade failure was the most likely reason for the crash. The airplane

had fewer than 400 hours of total flight time at the time of the incident. Because a power turbine blade would not be expected to fail so quickly, a reasonable jury could have found the power turbine blade was defective.

Pratt & Whitney also contends Rupert's testimony was inherently incredible because it displayed a fundamental misunderstanding regarding the operation of the engine. Rupert testified that a failed power turbine blade likely jammed the power section of the engine. He also testified that the resulting slowdown in the power turbine "caused the fuel control to provide more fuel to try to bring that speed back up," which in turn caused the engine to overheat. This would require the power turbine to send a signal to the fuel control to increase fuel flow to the engine. Pratt & Whitney's experts testified, however, that Rupert's scenario is impossible because there is no mechanism allowing the power turbine to send a signal to the fuel control.

Pratt & Whitney asks this court to entirely discount Rupert's testimony because its experts believe the testimony is implausible. Rupert was qualified as an expert under Fed.R.Evid. 702, a qualification not challenged on appeal. He did not base his opinion on impermissible factors, and the opinion rendered was within the scope of his expertise. Under these circumstances, the jury was free to decide for itself which explanation to believe. This court does not re-weigh the evidence presented to the jury. *United States v. Franklin–El,* 554 F.3d 903, 908 (10th Cir.2009). There was sufficient evidence for a finding by the jury that a defective power turbine blade caused the accident.

 Next, Pratt & Whitney claims it cannot be liable under a failure to warn theory because the theory was based entirely on omissions from a pilot operating

handbook written by Pilatus. This argument fails as well. The proper use of the manual override lever, as well as the proper method of shutting down an overheated engine, are matters concerning the use of the engine. As a manufacturer of a component part of the airplane, Pratt & Whitney was required to warn users of propensities that could render the product unreasonably dangerous. *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276, 283–84 (1978). Although this duty would presumably be discharged if the appropriate information were conveyed to users through Pilatus's pilot operating handbook, Pratt & Whitney would still be liable for the complete absence of any appropriate warning in the pilot operating handbook or elsewhere.

Finally, Pratt & Whitney argues there was no evidence presented that Smith would have done anything differently had he been warned about the proper use of the manual override lever and the dangers of rapidly shutting down an overheated engine. This contention fails in light of Smith's testimony that he attempted to follow the checklist procedures in the pilot operating handbook when the engine first experienced vibrations and when he attempted to restart the engine. This evidence allowed the jury to infer Smith would have followed alternative procedures or heeded appropriate warnings had they been in the handbook.

## IV. Conclusion

The district court correctly refused to apply admiralty jurisdiction. However, because Idaho has a more significant relationship with the case than does Colorado, the district court erred in refusing to apply Idaho's modified comparative fault statute. This error was not harmless and necessitates that the case be **reversed** and **remanded.** On remand, the district court must determine whether it would have instructed the jury regarding the effect of

Idaho's modified comparative fault statute. If the district court determines it would not have given the instruction, entry of judgment as a matter of law for the defendants is appropriate. If a new trial is warranted, Leadabrand's allowable recovery is limited to the value of the personal property left on the airplane. Additionally, Exhibits 105, 106, 108, 109, and 113 should not be admitted. Finally, the district court should not allow an expert to testify directly about the meaning of a federal aviation regulation.