FILED
United States Court of Appeals
Tenth Circuit

**January 26, 2022**

**Christopher M. Wolpert
Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

ROWAN THOMPSON,

     Plaintiff - Appellant,

v.

THOMAS RAGLAND, in his official
capacity as Associate Director for Student
Conduct for Metropolitan State University
of Denver,

     Defendant - Appellee.

No. 21-1143

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-03634-PAB-MEH)**
_____

Igor Raykin, Kishinevsky & Raykin, Aurora, CO (Michael Nolt, Kishinvesky & Raykin,
with him on the briefs), for Plaintiff - Appellant.

Natalie Powell, Office of the Colorado Attorney General, Denver, CO (Philip J. Weiser,
Colorado Attorney General, and Andrew Katarikawe, Office of the Colorado Attorney
General, with her on the briefs), for Defendant - Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **MATHESON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

     Rowan Thompson, a student at Metropolitan State University of Denver

(MSU), had a classroom dispute with her chemistry professor that ultimately

prompted Thompson to drop the professor's class. But when Thompson emailed her former classmates to express her displeasure with the professor and to suggest that her classmates leave "honest" end-of-term evaluations, Aplt. App. at 10, Thomas Ragland, MSU's Associate Director for Student Conduct, allegedly prohibited Thompson from further contacting the professor or even discussing the professor with any students taking any of the professor's classes.

Thompson sued Ragland under 42 U.S.C. § 1983, arguing that he violated her First Amendment right to freedom of speech. The district court dismissed the complaint for failure to state a claim, holding that Ragland had not violated clearly established law and therefore was entitled to qualified immunity. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings. Because one can infer from the allegations in the complaint that there was no proper justification for Ragland's actions, the complaint states a violation of clearly established law governing the regulation of student speech.

I.    BACKGROUND

On appeal from the grant of a motion to dismiss for failure to state a claim, we treat as true all well-pleaded factual allegations and view them in the light most favorable to the plaintiff. *See Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011). We proceed to summarize the allegations of the complaint.

Thompson has an eye condition that makes her sensitive to light, requiring that she sit in the first three rows of a classroom to see what is written on the white board. She was enrolled in a chemistry class at MSU taught by Dr. Megan Lazorski. On

2

February 4, 2019, Thompson arrived late to the class. Noting that all the seats in the first three rows were occupied, she sat on the floor in the front row. Dr. Lazorski did not approve, interrupting her lecture to instruct Thompson to take a seat. Although Thompson informed Dr. Lazorski about her eye condition, the professor still insisted that Thompson move to a seat, and she had students leave the front row so that Thompson could sit there.

A week later, Thompson again arrived late to Dr. Lazorski's class. Because all seats in the first three rows were taken, Thompson sat on the floor in the front row, in a space where a desk was missing. Dr. Lazorski instructed Thompson to move to a seat. Thompson said she preferred to sit on the floor in the front row because of her eye condition. Dr. Lazorski responded that the only options were to sit at a desk or leave the classroom. Thompson chose to leave class.

Thompson ultimately dropped Dr. Lazorski's class because of the seating dispute "and the unlikelihood of it being resolved." Aplt. App. at 8–9. MSU removed the class from Thompson's record, and the school refunded her tuition for the class. Still, Thompson was dissatisfied with how Dr. Lazorski had treated her. She complained about Dr. Lazorski to various top MSU officials and administrators in a letter. She also requested a mediation of her dispute with Dr. Lazorski, which took place on March 18. During the mediation Thompson was encouraged to fill out evaluation and class-rating forms to address her concerns about Dr. Lazorski's performance as a professor.

3

Thompson later realized, however, that she could not submit a review of the class or Dr. Lazorski's performance because she was no longer enrolled in any of the professor's classes. She proceeded to send the following email to her former classmates:

> Hello everyone, I'm Rowan- some of you may know me as the goth girl who sat on the floor in class. For those who don't know, I came late to class a couple of times and sat on the floor. It angered the professor enough that I was asked to leave class on the last occasion. A few weeks later, after a mediation attempt between the dean of chemistry and the professor, I had to drop the class to stop further confrontation- over sitting on the floor.
>
> I have heard so many of you say how horrible a time you're having in this class, that there are some bits that are ridiculous or downright unreasonable. You shouldn't have to suffer through a class, especially one that is required, and this is not what college is supposed to be like. College is supposed to make us feel excited about our futures and finally learn what we are interested in, not ditch class because we know we won't learn anything. You don't need to keep your complaints and troubles private; this is what the evaluations are for. They're online; the link to fill them out appears when you log into Blackboard, they take only a couple of minutes, are anonymous, and the more detail is said the better. Every issue you've had, every complaint? This is when the faculty and university is listening and wants to hear them. Students, including myself, who have dropped the class won't be able to fill out an evaluation- our voices cannot be heard unless we speak to the deans directly, but I know for a fact that many are afraid to speak face-to-face.
>
> Please, take the few minutes to review this chemistry class and be honest- make the faculty listen to you so that this class can change for the better. If not for yourself, than for those who have had to drop the class, feeling worthless and stupid, or for students who will have to take this class after you.
>
> Hang in there- you're almost done and then you can leave this semester behind you! ? ?
>
> -Rowan

Aplt. App. at 9–10. The complaint alleges that the email did "not involve a substantial interference or material disruption to the work of MSU" and did "not impinge on the rights of any other student." Aplt. App. at 13.

On April 25, Thompson received a letter from Ragland informing her that "the Dean of Students Office received reports that [Thompson] may have violated provisions of the Student Code of Conduct"; that these reports concerned "the disagreement between [Thompson] and Dr. Lazorski"; that, specifically, Thompson's email to her former classmates "may have violated the Student Code of Conduct"; that Thompson had to meet with Ragland; and that Thompson was subject to a "No Contact order" restricting her from communicating with Dr. Lazorski. Aplt. App. at 9–10. Ragland's letter specifically cautioned: "Further, due to the persistent communication and disruption your communication is about Dr. Lazorski (sic), you are restricted from discussing Dr. Lazorski with any student in the CHE 1800 course or any of Dr. Lazorski's classes, as this would be a violation of the this No Contact Directive (sic)." Aplt. App. at 10.

Thompson then filed the present suit. She sought compensatory and punitive damages, though not injunctive relief. Ragland moved to dismiss for failure to state a claim, asserting that he was entitled to qualified immunity. The district court granted the motion. It bypassed the constitutional question, holding that even if Ragland's conduct abridged the First Amendment, he did not violate clearly established law.

5

## II.    DISCUSSION

### A.    Qualified immunity

We review de novo a district court's ruling on a motion to dismiss a complaint because of qualified immunity. *See Brown*, 662 F.3d at 1162.

Public officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). To establish that the law was clearly established in this context, the plaintiff must point to Supreme Court or Tenth Circuit precedents in point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains. *See Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020). "[E]xisting law must have placed the constitutionality of the [public official's] conduct beyond debate." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). But "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (brackets and internal quotation marks omitted).

The procedural posture of the qualified-immunity inquiry may be critical. Because they turn on a fact-bound inquiry, "qualified immunity defenses are typically resolved at the summary judgment stage" rather than on a motion to dismiss. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a

6

qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (internal quotation marks omitted). On a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for [constitutionality]." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

### B.    Governing law

The seminal case addressing freedom of speech in the school context is *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). After learning of a planned student protest, the school district instituted a policy prohibiting high-school students from wearing armbands. *See id*. at 504. Two high-school students and a junior-high student nevertheless wore black armbands in protest of the Vietnam War, and they were suspended. *See id*. The Supreme Court said that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id*. at 506. But the Court also recognized that "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id*. at 513. Finding in the record no "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" and no "disturbances or

disorders on the school premises in fact," the Court held that the school district had violated the students' First Amendment rights. *Id*. at 514.

The Court soon extended *Tinker* to public universities and colleges in two cases. In *Healy v. James*, 408 U.S. 169, 170–79 (1972), the Court considered whether a state college's denial of a left-wing organization's application to form a student group denied the group's right of association under the First Amendment. The lower courts had held that no associational interest was infringed because all the college had done was deny the group the college's stamp of approval and the student group had not met its purported burden to show that it was entitled to recognition. *See id.* at 182–84. The Supreme Court reversed and remanded because the lower courts (1) had "discount[ed] the existence of a cognizable First Amendment interest," *id.* at 184 (by not considering that the organization was denied the use of campus facilities for meetings and the use of the school newspaper and campus bulletin boards, *see id.* at 181), and (2) had incorrectly placed the burden of proof on the students to show eligibility for recognition rather than on the college to prove ineligibility, *see id.* at 183–85. The Court recognized that "[s]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." *Id*. at 180. And it rejected "the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id*. Noting that "denial of recognition was a form of prior restraint," it imposed on the college a "heavy burden . . . to demonstrate the appropriateness of [the denial]." *Id.* at 184 (internal quotation marks omitted). But the Court cautioned that "First

8

Amendment rights must always be applied in light of the special characteristics of the environment in the particular case." *Id*. at 180 (ellipsis and internal quotation marks omitted). And the Court maintained that although students in higher education enjoy the protection of the First Amendment, a university "may expect that its students adhere to generally accepted standards of conduct" that govern "the time, the place, and the manner" of student speech. *Id*. at 192–93 (internal quotation marks omitted). The Court remanded to the lower court to determine whether the denial of recognition could be justified.

The next year, in *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667, 667–68 (1973) (per curiam), the Court considered the expulsion of a graduate student at a public university for her distribution of an underground newspaper that contained a vulgar headline and a political cartoon depicting policemen raping the Statue of Liberty. The university had found that the student had violated provisions of the university's code of conduct requiring students "to observe generally accepted standards of conduct" and prohibiting "indecent conduct or speech." *Id*. at 668. But the Court declared that there was not evidence of "any disruption of campus order or interference with the rights of others," *id*. at 670 n.6, and concluded that the student "was expelled because of the disapproved *content* of the newspaper rather than the time, place, or manner of its distribution," *id*. at 670, thereby violating the student's First Amendment rights, *see id.* at 671.

Since then, the Supreme Court has elaborated on the circumstances in which a school can penalize student speech. In *Bethel School District No. 403 v. Fraser*, 478

9

U.S. 675, 677–78 (1986), a student was disciplined for giving a speech to a school assembly in which he used an elaborate sexual metaphor. The Court held that a school may restrict "sexually explicit, indecent, or lewd speech," even if the speech is not disruptive. *Id*. at 684. In *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 262–64 (1988), a high-school principal prevented the school newspaper from publishing stories about pregnancy and divorce in the proposed issue. The Court held (1) that the school newspaper was intended "as a supervised learning experience for journalism students," not as a public forum, and its content was therefore subject to school regulation "in any reasonable manner," *id*. at 270; and (2) that schools "do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns," *id*. at 273. In *Morse v. Frederick*, 551 U.S. 393, 397–99 (2007), the Court reviewed a high-school student's suspension after he unfurled a banner arguably promoting marijuana use at a school-sponsored and school-supervised event. Recognizing that "*Tinker* [was] not the only basis for restricting student speech," *id*. at 406, the Court held that the school could "restrict student expression that they reasonably regard as promoting illegal drug use," *id*. at 408, even if the school could not show that the speech presented a "risk of substantial disruption," *id*. at 399 (internal quotation marks omitted); *see also id*. at 422–23 (Alito, J., concurring) (joining Court's opinion "on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily

10

justify any . . . speech restrictions [beyond those set forth in *Morse*, *Fraser*, and *Kuhlmeier*]").[1]

In addition to this Supreme Court authority, there is highly relevant circuit precedent. Thompson relies chiefly on *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996). The plaintiff was a member of his high school's football team who had been hazed by five teammates who duct-taped him, nude, to a towel rack. *See id.* at 1230. He reported the hazing to school administrators, the principal, and his coach. *See id.* But instead of disciplining the five teammates, the coach demanded that the plaintiff apologize to his teammates for betraying them. *See id.* He refused and was dismissed from the team. *See id.* He sued various school officials, the school, and the school district under § 1983, alleging, among other things, a First Amendment claim that he was denied a benefit (being on a football team) because of his speech (reporting the hazing incident to his parents and school officials). *See id.* at 1237. We held that,

---

[1] We also note the one Supreme Court decision on student speech that postdates the events in this case. In *Mahanoy Area School District v. B. L.*, 141 S. Ct. 2038, 2043 (2021), a student not selected for a school cheerleading squad posted a vulgar Snapchat message criticizing her nonselection while she was off campus outside of school hours. Although the Court recognized that a school's "license to regulate student speech" does not "always disappear when a school regulates speech that takes place off campus," *id.* at 2045, it held that the school had violated the student's First Amendment rights because the school was not engaged in (or authorized to engage in) any general effort to prevent off-campus vulgarity, the post did not sufficiently disrupt classroom or other school activities, and the post did not cause any serious decline in team morale, *see id.* at 2047–48. Because this decision was issued only in 2021, it cannot establish what the law clearly was when Thompson was disciplined. A recent case contrary to Thompson's position could indicate that law favoring Thompson was *not* clearly established at the time of her discipline; but *Mahanoy Area School District* is fully consistent with Thompson's theory of liability.

11

under *Tinker*, a school could restrict a student's speech only if the speech "would 'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Id.* (quoting *Tinker*, 393 U.S. at 509). We further followed *Tinker* in stating that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," and "the mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint cannot justify the prohibition by school officials of a particular expression of opinion." *Id.* (internal quotation marks omitted). Under the allegations of the complaint, the plaintiff's speech "neither disrupted classwork nor invaded the rights of other students," *id*. at 1238, and "[a]t most, the school's interest here was based on its fear of a disturbance stemming from the disapproval associated with [the plaintiff's] unpopular viewpoint regarding hazing in the school's locker rooms." *Id*. "Under *Tinker*," we concluded, "that is not a sufficient justification to punish [the plaintiff's] speech in these circumstances." *Id.* We held that the applicable law was clearly established and reversed the district court's dismissal on qualified-immunity grounds. *See id.* at 1238–39. We recognized, however, that the qualified-immunity issue could be revisited on a motion for summary judgment. *See id.* (citing *Behrens*, 516 U.S. at 305–09).

On the other hand, in *Taylor v. Roswell Independent School District*, 713 F.3d 25, 28–29 (10th Cir. 2013), we upheld the school's disapproval of the distribution of rubber fetus dolls by a group of religious high school students opposed to abortion. By the time that school officials halted distribution, some students had used

12

dismembered heads of the dolls as rubber balls and thrown them against the wall; others threw dolls and doll parts at the ceiling, where they became stuck; some dolls were used to plug toilets; others were set on fire; and classroom instruction was disrupted when students threw dolls and doll parts during class. *See id.* at 31. We held that halting further distribution of the dolls was justified under *Tinker* by the reasonable belief that further substantial disruption would occur. *See id.* at 37–39.

### C.    Analysis

We think the foregoing precedents clearly establish that Thompson's complaint adequately states a First Amendment violation. Indeed, this case is, at least at the present stage of the proceedings, an easy one. Thompson's speech was restricted. And there is no apparent legitimate basis for this restriction.

On appeal Ragland has not argued that Thompson's communications were vulgar, as in *Fraser*, 478 U.S. at 677–78, or otherwise violated valid restrictions on the time, place, or manner of speech, *see Healy*, 408 U.S. at 192–93. Nor has he suggested that Thompson was disciplined for violating the rules for engaging in school-sponsored expressive activity, *see Kuhlmeier*, 484 U.S. at 273, or for advocating unlawful conduct, *see Morse*, 551 U.S. at 408. Though Ragland's letter to Thompson suggested that "she may have violated" MSU's Student Code of Conduct, Aplt. App. at 9, on appeal he has not claimed such a violation, and the record does not support any violation.[2]

---

[2] Even on a motion to dismiss, Ragland could have produced the Code and asked the district court to consider it. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th

The justification for the restriction that Ragland provides in his briefs is that Thompson created disruption. He relies in part on the disruption caused to the two classes Thompson attended when she sat on the floor. Those two classes were in early February 2019. Ragland's letter to Thompson was in late April. In the interim (sometime after the mediation on March 18) Thompson sent her email to fellow students. A reasonable factfinder could readily determine that the discipline was imposed on Thompson because of the email, not just because of the two classroom incidents that caused minimal disruption and had apparently been resolved by Thompson's dropping the class. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (requiring but-for causation to establish claim of First Amendment retaliation).

The other possible cause of disruption was Thompson's email to fellow students. But there is no evidence of any disruption caused by the email; on the contrary, the complaint alleges that there was no disruption to the work of MSU, and none was mentioned in Ragland's letter imposing the discipline. Nor could disruption be reasonably anticipated. Thompson merely sent a respectful, noninflammatory email expressing her dissatisfaction with a professor's performance and encouraging her former classmates to submit "honest" reviews about the class and the professor. Aplt. App. at 9–10. What Ragland argues in his appellate brief is remarkable. He claims that Thompson's "efforts to encourage other students to give negative

---

Cir. 2010) (court reviewing motion to dismiss can consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" (internal quotation marks omitted)).

evaluations would disrupt Dr. Lazorski's career and her relationship with her students, as well as [MSU's] efforts in employing faculty to conduct the class." Aplee. Br. at 20. This rationale is totally inconsistent with our opinion in *Seamons*, where the plaintiff's complaint against his teammates could have caused them serious repercussions. If we were to accept that rationale, there would be no First Amendment protection for criticism of government employees. Moreover, student critiques of faculty members are widely recognized as a useful mechanism for improving college teaching, and the complaint alleges that Thompson was encouraged at the mediation to submit an evaluation of her professor. It was only after she learned that her departure from the class precluded her from submitting her own evaluation that she sent the email encouraging others to do so.

We conclude that at the time of Ragland's letter to Thompson, the law was clearly settled that Thompson could not be disciplined for sending her email to fellow students, at least as the facts are alleged in the complaint. To be sure, we cannot point to a precedent with identical facts. But the law was clear that discipline cannot be imposed on student speech without good reason. And when, as here, that discipline takes the form of a prior restraint on student speech, the law is especially clear: such prospective, content-based restrictions "carr[y] a presumption of unconstitutionality," *Taylor*, 713 F.3d at 42; *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59 (1975) ("The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties."). Ragland therefore bore a "heavy burden" to justify imposing such

15

limitations on Thompson's speech. *Healy*, 408 U.S. at 184 (internal quotation marks omitted). He has provided no such justification. As we had occasion to recognize quite recently, "conduct can sometimes violate a clearly established right even though the very action in question has not previously been held unlawful." *Sturdivant v. Fine*, No. 20–3147, 2022 WL 67734 at \*6 (10th Cir. Jan. 7, 2022) (internal quotation marks omitted).

Of course, not every detail of the First Amendment law governing student speech is (or ever will be) settled. The recent *Mahanoy Area School District* decision by the Supreme Court acknowledged as much when it refrained from setting forth a comprehensive rule stating when schools can regulate off-campus speech. *See* 141 S. Ct. at 2045. But a great deal is settled. And in any given case the unsettled contours of the law may be irrelevant. For example, if it is clearly settled that imposing discipline for certain speech would be improper even if it was considered on-campus speech, then it is unnecessary to decide whether the speech was actually on campus rather than off campus (in which event the authority to impose discipline would be diminished). That is why Ragland can take little comfort from the two unpublished decisions of this court that he relies on in arguing that the law is not clearly established.[3] We summarize both decisions.

---

[3] An unpublished opinion cannot clearly establish the law, but it "can be quite relevant in showing that the law was *not* clearly established." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018).

In *Hunt v. Board of Regents of University of New Mexico*, 792 F. App'x 595, 598 (10th Cir. 2019), a University of New Mexico (UNM) medical student voiced his displeasure with the results of the 2012 presidential election in a Facebook post laced with vulgarity and attacks on pro-choice voters. UNM determined that the student's post had violated its campus-wide policy prohibiting "unduly inflammatory statements or unduly personal attacks" and "harass[ment of] others," as well as the UNM School of Medicine policy cautioning students to "[e]xercise discretion, thoughtfulness and respect for . . . colleagues, associates and the university's supporters/community" and to "[r]efrain from engaging in dialogue that could disparage colleagues, competitors, or critics." *Id*. (original brackets and internal quotation marks omitted). Accordingly, UNM administrators informed the student that any recommendation letters provided by the dean for the student's residency applications would report a professionalism violation unless the student took remedial measures. *Id*. at 599. We held that the UNM administrators were entitled to qualified immunity on the student's First Amendment claim, noting that some caselaw supported allowing professional schools "space" to hold students to "customary professional standards" and that the law was unsettled regarding whether students could be held accountable for "off-campus, online speech for the purpose of instilling professional norms." *Id*. at 605. The uncertainty regarding authority over off-campus, online speech was relevant only because there was authority to support discipline of students for their on-campus unprofessional speech.

17

In *Yeasin v. Durham*, 719 F. App'x 844, 845 (10th Cir. 2018), the plaintiff was an undergraduate at the University of Kansas (KU) who had physically restrained his ex-girlfriend A.W. in his car, taken her phone, threatened to kill himself if she broke up with him, threatened to spread rumors, and threatened to make the KU campus so hostile that A.W. would not want to attend school anywhere in the State. KU officials instituted a no-contact order prohibiting the student from communicating with A.W., or her family or friends. *See id.* at 846. After the student violated the order, KU expelled him. *See id.* at 846–48. Noting that the caselaw was unclear about the scope of a university's power to regulate speech that invades the rights of other students but that occurs off-campus or online, we held that the KU officials were entitled to qualified immunity. *Id*. at 850–52.

In contrast to *Hunt* and *Yeasin*, in this case it does not matter whether the law was unsettled regarding a school's power to regulate off-campus and online speech. Whatever the law said about this at the time of Ragland's actions, there would have been no reason for a university official to think that he had *more* power to regulate student speech as that speech's nexus to the university became more attenuated. *Hunt* and *Yeasin* concerned situations where student speech was at least arguably subject to discipline under established precedents—in *Hunt*, the plaintiff's speech may well have violated a professional school's legitimate standards of professional conduct, and in *Yeasin*, the plaintiff's speech likely constituted harassment. Those opinions discussed the law governing schools' ability to regulate students' off-campus and online speech only because the nexus between the universities' operation and the

students' speech in those cases was weakened by the fact that such speech occurred off campus and over the Internet. That weakened speech-university nexus made it less clear whether the discipline imposed in those cases was within the universities' authority. In contrast, even if Thompson's request that her classmates submit evaluations of Dr. Lazorski's class had played out on campus and in person, it still would have been clearly unlawful for Ragland to discipline Thompson and suppress her speech, as alleged in the complaint. If anything, the fact that Thompson's speech occurred off campus and online—reducing the speech-to-university nexus and thus MSU's power to regulate the speech—makes the alleged First Amendment violation *clearer*, not less clear.

We note, however, that Ragland has not yet had an opportunity to present evidence that might justify his actions. Because the district court disposed of the case on a Rule 12(b)(6) motion, Ragland has not even filed an answer. Our holding today is therefore limited. Ragland may be entitled to qualified immunity at the summary-judgment stage, when a clearer picture of what happened will have emerged. *See Behrens*, 516 U.S. at 305–09 (defendant who unsuccessfully moved to dismiss complaint could still move for summary judgment on ground of qualified immunity).

### III.    CONCLUSION

Thompson has sufficiently stated a claim to withstand dismissal under Rule 12(b)(6). We **REVERSE** the district court's dismissal on qualified-immunity grounds and **REMAND** for further proceedings.

19