**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

JESSICA OSBORN,

    Plaintiff - Appellant,

v.

CHRIS MEITZEN, individually,

    Defendant - Appellee.

No. 21-7069
(D.C. No. 6:20-CV-00096-SPS)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **KELLY**, and **PHILLIPS**, Circuit Judges.
_____

Plaintiff-Appellant Jessica Osborn appeals from the grant of summary

judgment on the basis of qualified immunity in favor of Defendant-Appellee Officer

Chris Meitzen.  Osborn v. Meitzen, No. CIV-20-96-SPS, 2021 WL 5495179 (E.D.

Okla. Nov. 23, 2021).  A magistrate judge exercised civil jurisdiction pursuant to

consent of the parties.  28 U.S.C. § 636(c).  We have jurisdiction under 28 U.S.C.

§ 1291 and we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**Background**

On April 12, 2018, Deputy Mark Idell of Bryan County Sheriff's Office saw Ms. Osborn driving a motorcycle without a working taillight around 9:40 p.m. Aplt.App. 10.  He began following Ms. Osborn north on Leavenworth Trail in Bryan County, Oklahoma.  Id.  There was no southbound traffic at the time.  Id.  Deputy Idell signaled that he was going to pull Ms. Osborn over with his emergency lights, but Ms. Osborn instead accelerated.  Id.  Deputy Idell radioed the Bryan County Sheriff's Office that he was in pursuit of a fleeing motorcycle.  Id.

Leavenworth Trail is a rural, two-lane road surrounded by farmland.  Id. 11. There is an unobstructed view in each direction.  Id.  Ms. Osborn passed the intersection of Leavenworth and Platter Road without stopping at the stop sign, but slowed down at the next intersection of Leavenworth and Smiser Road before turning onto Smiser.  Id. 11–13.  Smiser Road is a rural, two-lane road with no median, shoulders, or lights.  Id. 14 (Image of Smiser Road).  It is about 20 feet wide.  Id. 40. At this time, there were no other vehicles or pedestrians on Smiser Road.  Id. 17.

Officer Meitzen was on duty and responded to the pursuit after Deputy Idell radioed in.  Id. 10, 14.  He activated his emergency lights, which activated his dashboard camera.  Id. 40, 139; see Ex. 32-6.  When Ms. Osborn turned east onto Smiser Road with Deputy Idell following her, Officer Meitzen was already driving west down the center of Smiser toward Ms. Osborn.  Aplt. App. 40, 138.  As they approached each other, Officer Meitzen pulled his car to the left side of the road but Ms. Osborn could not stop in time.  Id. 16; see Ex. 32-6.  She crashed into the front

2

right side of his car.  Aplt. App. 16.  Ms. Osborn's blood sample taken after the crash was positive for methamphetamine and other substances, but neither officer was aware of this during the pursuit.  See id. 57.  Ms. Osborn was driving at about 90 miles per hour at the time of the collision.  Id. 41, 144.  Ms. Osborn suffered severe injuries, was airlifted to a hospital, and ultimately survived.  Id. 21–22.

In the light most favorable to Ms. Osborn, Officer Meitzen intentionally caused the crash by blocking the roadway.  Id. 14–15, 144–46.  Officer Meitzen disputes this and contends that the dash cam shows he was attempting to get out of Ms. Osborn's way and the collision was accidental.  Id. 41; see Ex. 32-6.  Prior to the collision, Officer Meitzen was unaware of facts that would have required him to use "any kind of force" against the motorcyclist.  Aplt. App. 39.

Ms. Osborn brought two claims under 42 U.S.C. § 1983: (1) use of excessive force under the Fourth Amendment against Officer Meitzen and (2) municipal liability against Calera, Oklahoma, under Monell v. Department of Social Services, 436 U.S. 658 (1978).  Aplt. App. 22–24, 25–29.  Ms. Osborn stipulated to the dismissal of the municipal liability claim.  Id. 131.  Officer Meitzen moved for summary judgment on Ms. Osborn's claim against him.  Id. 84–97.

The district court determined that a genuine issue of material fact existed regarding whether the collision was intentional or accidental, but held that Ms. Osborn did not identify an analogous case from the Supreme Court or Tenth Circuit clearly establishing "that a law enforcement officer intentionally causing a collision in order to stop a fleeing individual" is prohibited.  Id. 206–07, 210.  On appeal, Ms.

3

Osborn argues that the district court (1) did not address her argument that the law was clearly established because the officer's conduct was obviously unconstitutional and (2) erred in concluding that the law was not clearly established. Aplt. Br. at viii–ix, 15. Ms. Osborn also takes issue with the district court's comment that it was not convinced that she posed no threat to others as she fled. Id. at 32.

## Discussion

We review the district court's summary judgment determination de novo. Lance v. Morris, 985 F.3d 787, 793 (10th Cir. 2021). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, this court is required "to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in [her] favor." Est. of Beauford v. Mesa Cnty., 35 F.4th 1248, 1261 (10th Cir. 2022).

Officers are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138. S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). Courts have discretion to begin at either step. WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136 (2018). Ms. Osborn bears the burden of showing "the violation of a constitutional or statutory right and the clearly established nature of that right." Lance, 985 F.3d at 793.

### A. Constitutional Violation

To state an excessive force claim under the Fourth Amendment, Ms. Osborn must show that (1) a seizure occurred, and (2) the seizure was unreasonable. Thomas v. Durastanti, 607 F.3d 655, 663 (10th Cir. 2010). A seizure requires intentional, not accidental, use of force. Torres v. Madrid, – U.S. –, 141 S. Ct. 989, 998 (2021). The district court found there was a genuine issue of material fact regarding whether Officer Meitzen deliberately or accidentally collided with Ms. Osborn. Aplt. App. 207. The dissent expands on whether there was a constitutional violation. Dissent at 2–6. Given the posture of the case, it is unnecessary to decide the constitutional violation question because we conclude that Ms. Osborn has waived her argument on clearly established law. See WesternGeco, 138 S. Ct. at 2136.

### B. Clearly Established Law

To show that "the law was clearly established in this context, the plaintiff must point to Supreme Court or Tenth Circuit precedents [o]n point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains." Thompson v. Ragland, 23 F.4th 1252, 1255 (10th Cir. 2022). Courts must not "define clearly established law at a high level of generality," but must consider "whether the violative nature of particular conduct is clearly established." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). A clearly established right is one "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."

5

Id. at 11 (quoting Reichle, 566 U.S. at 664).  An officer's subjective beliefs about his or her conduct are irrelevant.  Anderson v. Creighton, 483 U.S. 635, 641 (1987).

On appeal, Ms. Osborn argues that a right can be clearly established, without analogous case law, when the conduct is so egregious that general precedent applies with "obvious clarity."  See Aplt. Br. at 27–29 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  Generally, deadly force "may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3 (1985).  She argues this is the "rare obvious" case because any police officer would know that it is unconstitutional to use deadly force against a person who poses no threat to the public, herself, or an officer.  Aplt. Br. at 28–29 (internal quotation marks omitted).

Before the district court, Ms. Osborn did not use the word "obvious" nor explain how general statements of law apply to the facts of this case under Hope. Aplt. App. 158–59.  This raises the issue of waiver because we generally do not address arguments raised in an underdeveloped and perfunctory manner before the district court.  GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1207 (10th Cir. 2022).  A party does not preserve an issue when it presents the issue to the district court in a vague and ambiguous way, or makes only a "fleeting contention."  Id. at 1206 (quoting U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd., 582 F.3d 1131, 1142 (10th Cir. 2009)).  Ms. Osborn does not argue for plain error review on appeal.  See id. at 1206–07.

6

At the district court, Ms. Osborn devoted less than a page to explaining how she met the clearly established law requirement, and most of her argument merely summarized the standard. Aplt. App. 158–59. On appeal, she tells us that her argument consistently has been that the case "rested on Hope." Aplt. Br. at 27; cf. also Oral Argument at 1:50–2:34 (arguing that the district court had a duty to and did not address Hope); id. at 8:20–9:55 (panel member questioning whether the district court's failure to address Hope precluded appellate review and if remand was required). She did cite Hope before the district court for the claim that Officer Meitzen was on fair notice. But that is far short of an argument that she is entitled to rely on Garner's general statements concerning excessive force or that this is the rare obvious case to which Hope applies. Aplt. App. 158–59. Two broad sentences stating that the law at the time put Officer Meitzen on fair notice, followed by the conclusory sentence that "[t]hus, the second prong of the qualified immunity analsys [sic] has been met" is merely a fleeting contention. Id. 159. Ms. Osborn's inadequate presentation is noted by Officer Meitzen. See Aplee. Br. 19–21 (observing Ms. Osborn "failed to present clearly established law" before the district court and that she did not argue why her cited cases applied to the instant case).

In addition, Ms. Osborn's entire first issue on appeal is that the district court erred by not considering or addressing her argument under Hope that the officer's conduct was obviously unconstitutional. Aplt. Br. at viii, 17–18. But the district court may not have addressed the argument because it was inadequately presented. See GeoMetWatch, 38 F.4th at 1205. The district court mentioned Hope as it

7

discussed the meaning of "clearly established," recognizing that Hope applies only to the "rare obvious case" involving extreme or egregious misconduct. Osborn, 2021 WL 5495179, at *4, n.2. But this is in its discussion of the applicable standard and it did not undertake further analysis of whether this is the "rare obvious" case. While the dissent reads the district court's order as addressing the obviousness theory, even Ms. Osborn concedes that it did not, arguing that "[t]he district court erred because it never conducted the analysis under Hope, as it should have." See Aplt. Br. at 11–12. We can hardly fault the district court for not addressing an argument vaguely presented at best.

Therefore, because Ms. Osborn's presentation before the district court is wholly inadequate to support the argument she now makes, and she does not argue plain error, we decline to consider it.[1] The argument is waived. Officer Meitzen is therefore entitled to qualified immunity.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

---

[1] Although we retain discretion to address arguments made for the first time on appeal, we do so "only in the most unusual circumstances." Lyons v. Jefferson Bank & Tr., 994 F.2d 716, 721 (10th Cir. 1992). "[C]onsiderations of fairness to both the district court and the opposing party" guide our application of the waiver rule. See Daigle v. Shell Oil Co., 972 F.2d 1527, 1540 (10th Cir. 1992) (citing Hicks v. Gates Rubber Co., 928 F.2d 966, 970–71 (10th Cir. 1991)).

21-7069, *Osborn v. Meitzen*
Phillips, J. dissenting.

The sole disputed fact on summary judgment was *why* Officer Meitzen veered his patrol car into Ms. Osborn's path. The patrol-car video shows that she was riding the motorcycle well within her lane and would have passed by Officer Meitzen's oncoming patrol car had he not veered in front of her. His driving caused her motorcycle to deflect off the front passenger side of his car and crash. Everyone knows what happens when motorcyclists crash at ninety miles per hour. They fly, bounce, skid, and stop after grinding to a halt or striking a fixed object such as a fence post. If lucky, they suffer serious bodily injuries but survive.

On that question of why, Officer Meitzen denies intentionally causing the motorcycle crash. He claims that he chose that inopportune time to cross the left side of the road to turn around while trying to join Officer Idell's already-close pursuit. But in reviewing the summary-judgment order, we abide by the district court's ruling that a reasonable jury could find that Officer Meitzen did intentionally cause the crash to stop the motorcycle and end the pursuit.

As the majority opinion notes, on summary judgment we resolve factual disputes and inferences in Ms. Osborn's favor, but she bears the burden of overcoming Officer Meitzen's qualified-immunity defense. To succeed in that, she must make two showings: (1) that Officer Meitzen unreasonably seized her in violation of the Fourth Amendment, and (2) that clearly established law says so. Unlike the majority, I see a need to resolve these questions.

1.  The Constitutional Violation: Unreasonable Seizure

In *Tennessee v. Garner*, the Court had "to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon." 471 U.S. 1, 3 (1985). The Court concluded "that such force may not be used unless it is necessary to prevent the escape *and* the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* (emphasis added). As for what qualifies as a Fourth Amendment seizure, the Court declared that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Id.* at 7 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 879 (1975)). Further, the Court declared that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id.*

As the method for measuring the reasonableness of a seizure, the Court relied on its longstanding test of "balancing the extent of the intrusion against the need for it." *Id.* It described this "'balancing of competing interests' as 'the key principle of the Fourth Amendment.'" *Id.* at 8 (quoting *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981)). It held that the officer's shooting of a fleeing burglary suspect amounted to an unreasonable seizure. *Id.* at 10-11 ("[S]hooting nondangerous fleeing suspects is [not] so vital as to outweigh the subject's interest in his own life.").

Considering when an officer may reasonably use deadly force against "felony suspects," the Court set a simple rule: "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does

2

not justify the use of force to do so." *Id.* at 11. Further, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*

If the jury found that Officer Meitzen intentionally caused Ms. Osborn to crash her motorcycle, *Garner* would compel the conclusion that he seized her within the meaning of the Fourth Amendment. His intentional act would have succeeded in ending the chase and bringing her into police custody. Further, because Ms. Osborn presented little (if any) danger to the officers or others that evening, *Garner* would further compel the conclusion that Officer Meitzen *unreasonably* seized her by his use of deadly force.

As for any danger Ms. Osborn presented to the officers and the public, the parties agree that she was fleeing at about ninety miles per hour on a rural paved road late in the evening. Officer Idell sought to stop her for a taillight violation. Visibility was clear, and automobile lights were fully visible. Officer Meitzen's patrol-car video shows that Ms. Osborn was riding well within her lane of travel when he veered his patrol car in her path. Leading up to the crash, no other motor vehicles are on the roadway. Nor did the officers testify about encountering any other vehicles during the chase. So based on the evidence at summary judgment, Ms. Osborn presented little danger, especially in comparison to other automobile-chase cases.

The officer's response to this barely perceptible danger was to use deadly force (assuming for summary-judgment purposes throughout this dissent that Officer Meitzen

3

intentionally caused the motorcycle crash). Sending a motorcyclist hurtling through the air at ninety miles per hour is a sure recipe for death or serious bodily injuries.

So there it is. The district court has held that a reasonable jury could find that Officer Meitzen intentionally used a high degree of deadly force in response to a misdemeanant motorcyclist presenting no or little danger to the officers or others. And in those circumstances, *Garner* would dictate the outcome. Under *Garner*'s balancing test, the seizure would be unreasonable. It might be otherwise if Ms. Osborn had seriously endangered the officers or others. But she didn't. And our circuit's precedent further backs that up.

In *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), this court considered a claim for an unreasonable seizure under the Fourth Amendment. That suit was brought by the estate of a motorist fatally shot during a high-speed-chase episode. We began by noting that "[a] Fourth Amendment claim of excessive force is analyzed under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries." *Id.* at 1188 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). We recognized that the reasonableness question required "us to weigh 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 1188 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

The government has an interest in protecting officers and others from dangerous driving that threatens their safety. *Cordova* illustrates this. We summarized the district court's findings this way:

> [T]he district court held that the sheer danger demonstrated by Mr. Cordova, who had persisted in a car chase in which he had repeatedly refused to stop, had run through at least two red lights, had driven off the road to avoid the deployment of stop sticks, had allegedly attempted to ram multiple officers' patrol cars, and who was now towing a large piece of machinery on the wrong way down a highway at one in the morning, justified a reasonable officer in using deadly force to terminate the chase.

*Id.* at 1187.

We concluded that Mr. Cordova's dangerous driving wasn't sufficiently dangerous to justify the use of deadly force nearly certain to cause death. *Id.* at 1189–90. The deadly force was a gunshot that struck the back of Mr. Cordova's head (the officer's three or four other shots missed him). The officer claimed to have shot because Mr. Cordova's truck was bearing down on him. But for summary-judgment purposes, a genuine issue of material fact remained on this point: the fatal shot had come more from the side of the truck rather than the front. *Id.* at 1187. Though recognizing (among other things) that "Mr. Cordova was driving recklessly down the wrong side of the highway," we noted that the officer had not shown "that any other motorists were in the vicinity, or that other motorists would not be able to spot Mr. Cordova and avoid an accident themselves." *Id.* at 1190.

Turning next to the level of deadly force used, we noted that "deadly force" is not a "unitary concept." *Id.* at 1189 (citing *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). By this, we meant that "the term encompasses a range of applications of

5

force, some more certain to cause death than others." *Id.* We concluded that "the reasonableness balancing must take into account that there is a spectrum of 'deadly force.'" *Id.* Some police conduct is likely to cause serious bodily injury or death (such as ramming an automobile as in *Scott*), and some is "nearly certain to cause death, such as a shot to the head." *Id.*

The magnitude of deadly force used by Officer Meitzen in veering in front of Ms. Osborn's speeding motorcycle is equivalent to that used in firing a gunshot at a fleeing suspect. Death is no surprise either way. Ms. Osborn is lucky to be alive, and Mr. Cordova was unlucky to be killed. And even if firing a gun is more likely to cause death than intentionally colliding into a motorcycle, Ms. Osborn would still have shown an unreasonable seizure. Because she presented far less danger than Mr. Cordova did, the police had less leeway in their use and choice of deadly force.

2.  Clearly Established Law

Ordinarily, a general rule like *Garner*'s will not provide clearly established law sufficient to prevail on unreasonable-force claims under the Fourth Amendment. But as explained above, Ms. Osborn's case is not an ordinary one. The circumstances of her case meet the condition that "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (cleaned up) (quoting *United States v. Lanier*, 520 U.S. 259, 270-71 (1997)).

6

The "obvious clarity" here stems from the minimal (if any) danger to the officers or others when Officer Meitzen intentionally used such a high degree of deadly force. In those circumstances, the Supreme Court's direction is plain for law-enforcement officers—"[deadly] force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the officer or others." *Garner*, 471 U.S. at 3. Here, the deadly force used was at the top end of its scale, and the danger presented was at the bottom end of its scale. In fact, even Officer Meitzen testified that an officer intentionally causing the collision would be using deadly force and that he was unaware of any facts that would have justified the use of any force on Ms. Osborn. Echoing that, Officer Idell testified that intentionally causing the collision would not have been objectively reasonable.

Moreover, *Cordova* by itself supplies the needed clearly established law here. As mentioned, our court held there that Mr. Cordova's dangerous driving—entering the oncoming traffic lane and continuing to drive, trying to ram police cars, leaving the roadway to avoid spikes, and the like—was not enough to justify the deadly force used. If Mr. Cordova's extremely dangerous driving didn't justify the deadly force used, Ms. Osborn's mere speeding doesn't either.

3.  The District Court's Ruling on the Clearly-Established-Law Prong

I disagree with the district court that its cited Supreme Court cases offer it any help. Those cases involved fleeing criminals who recklessly endangered the lives of the officers and others. Therefore, they are poor candidates to be resolved by *Garner*'s

7

general rule. *See, e.g.*, *Mullenix v. Luna*, 577 U.S. 7, 8-10 (2015) (per curiam) (high-speed chase on an interstate highway involving motorist evading an arrest warrant in which the possibly intoxicated motorist called dispatch threatening to shoot a police officer, resulting in a deputy shooting at the car's engine block to disable the car but instead hitting the driver four times and killing him); *Scott v. Harris*, 550 U.S. at 379–80 (high-speed chase on a two-lane road while swerving around more than a dozen cars, crossing yellow lines, and causing cars in both directions to pull to the shoulder to avoid being hit, all of which placed "police officers and innocent bystanders alike at great risk of serious injury"). In those situations, and others like them, courts correctly ruled that the plaintiffs had failed to show the officers violated clearly established law, as needed to defeat qualified immunity, because the Court determined that officers could not have objectively known whether the obvious dangers justified their uses of deadly force. Ms. Osborn's case presents far different circumstances.

In my view, the district court's order granting summary judgment takes qualified immunity to a new and disturbing place. Under it, an officer enjoys qualified immunity despite intentionally veering into the path of an oncoming motorcyclist just to end another officer's pursuit for a taillight violation. *Garner* prohibits this, as does *Cordova*. As mentioned, the officers here understood that intentionally causing the motorcycle crash would exceed their lawful authority. In these egregious circumstances, Ms. Osborn need not furnish a case in which an officer intentionally crashed a motorcyclist.

Finally, I note that the district court acknowledged Ms. Osborn's citation to a case like her own. In *Walker v. Davis*, a sheriff's deputy rammed a motorcycle from behind as

8

it drove across an open field during a chase (at least as assumed for summary judgment). 649 F.3d 502, 503 (6th Cir. 2011). The deputy had earlier tried to stop the motorcyclist for speeding, but the motorcyclist managed to evade him and "eventually turned off the road and cut across a muddy field." *Id.* Based on a variety of facts, an expert opined that the deputy had rammed the motorcycle, causing its driver to be thrown off and "dragged underneath the cruiser, crushing him to death." *Id.*

In *Walker*, the court began by noting that "[i]t has been settled for a generation that, under the Fourth Amendment, '[w]here a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" *Id.* (quoting *Garner*, 471 U.S. at 11). The court found it unimportant that "there were few, if any, reported cases in which police cruisers intentionally rammed motorcycles." *Id.* at 503. The court ruled the facts assumed for summary-judgment purposes "make out a violation of [the motorcyclist's] clearly established constitutional rights." *Id.* at 504. After all, the court noted, "[i]t is only common sense—and obviously so—that intentionally ramming a motorcycle with a police cruiser involves the application of potentially deadly force." *Id.* at 503–04. From this, it followed that "[t]his case is thus governed by the rule that 'general statements of the law are capable of giving clear and fair warning to officers even where the very action in question has not previously been held unlawful.'" *Id.* at 504 (citation omitted).

Based on clearly established law, the balance of the two reasonableness balancing factors—(1) Ms. Olson's lack of danger to the officers and others and (2) Officer Meitzen's particular use of deadly force—compels a conclusion that Officer Meitzen

unreasonably seized Ms. Osborn. I would reverse the district court's order granting summary judgment for qualified immunity and allow Ms. Osborn to present her case to the jury.

> 4.  The Majority's Disposition: Forfeiture and Waiver

The majority resolves neither prong of the qualified-immunity analysis. Instead, it affirms the district court's grant of summary judgment on grounds that Ms. Osborn forfeited her present argument by not making it in the district court, and further, that she has now waived the argument by not addressing the plain-error standard on appeal. This sudden end to Ms. Osborn's case puts me in mind of the sudden end to her motorcycle ride. Why would Ms. Osborn anticipate the majority's ruling when Officer Meitzen never even asserted forfeiture or waiver in his response brief in this court?

In opposing summary judgment in the district court, Ms. Osborn acknowledged not having a case factually on point. But she didn't throw up her hands and give up. She began by articulating the *Hope* standard:

> In the context of the applicability of the doctrine of qualified immunity, the Supreme Court has cautioned against "rigid overreliance on factual similarity" in determining whether law is clearly established. *Hope*, 536 U.S. at 742. An official can be on notice that conduct is unlawful "even in novel factual circumstances." *Id.* at 741-42 (concluding that officials who tied a prisoner to a hitching post for seven hours violated clearly established rights "of which a reasonable person would have known").

Appellant's App. 158-59. Her reliance on the *Hope* fair-notice argument did not end there. She cited a string of case authority for the proposition that she didn't need such a factually similar case. *Id.* at 159 (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004); *Hope*, 536 U.S. at 741; *Graham v. Connor*, 490 U.S. 386, 396 (1989);

*Garner*, 471 U.S. at 7). The district court indisputably recognized Ms. Osborn's *Hope* argument (though not analyzing it to her satisfaction), as it noted that we have "urged caution in applying the *Hope v. Pelzer* rule of 'fair warning' only to the 'rare obvious case involving extreme circumstances or particularly egregious misconduct.'" Prelim. R. 14 n.2 (quoting *Frasier v. Evans*, 992 F.3d 1003, 1021 (10th Cir. 2021)).

Ms. Osborn no doubt relied on *Hope*, *Garner*, and the like for a simple reason—in limited circumstances, courts permit a plaintiff to proceed despite not having a controlling and factually on-point case. She cites the same cases on appeal for the same reason. I fail to see how she hasn't preserved her appellate argument. *See also Stahmann Farms, Inc. v. United States*, 624 F.2d 958, 961 (10th Cir. 1980) ("This [waiver] principle is relaxed somewhat where the question is one of law and failure to hear it results in miscarriage of justice." (citation omitted)).

Further, Ms. Osborn cited in the district court the previously discussed *Walker* case. She relied on *Walker*'s holding that the plaintiff had established a violation of clearly established law despite not having a case involving similar facts. Ms. Osborn's reliance on *Walker* further shows she made the argument in the district court that she now makes on appeal.

Though the majority can't see where Ms. Osborn preserved her present argument in the district court, the district court didn't have the same problem. After all, it raised the legal principle from *Garner* now at issue on appeal. The court stated that it "is mindful of the Supreme Court's admonition that '[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does

11

not justify the use of deadly force to do so.'" Prelim. R. 16 (alteration in original) (quoting *Garner*, 471 U.S. at 11). It also addressed Ms. Osborn's *Walker* argument, though not analyzing that case's conclusion that the injured plaintiff had established a violation of clearly established law. Instead, the district court simply stated that as an out-of-circuit opinion, *Walker* "is insufficient to identify a clearly established law *in this Court*." *Id.* at 11. But Ms. Osborn obviously relied on *Walker* as support for her position that she had satisfied the clearly-established-law prong of the qualified-immunity analysis too.

5.  Conclusion

For all these reasons, I respectfully dissent. I would reverse the district court's grant of summary judgment on the qualified-immunity issue and remand for trial.